IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SOLID STATE CHEMICALS LTD. and <br> SOLID STATE CHEMICALS INC., <br><br> Plaintiffs, <br><br> v. <br><br> ASHLAND LLC, <br><br> Defendant. | Civil Action No. 19-1044 <br><br> Judge Marilyn J. Horan |

**OPINION AND ORDER**

Plaintiffs, Solid State Chemicals Ltd. and Solid State Chemicals Inc. (collectively, "Solid State"), filed the present Complaint on August 19, 2019, claiming breach of contract and negligent misrepresentation. (ECF No. 1). On October 7, 2019, Defendant, Ashland LLC, moved to dismiss the Complaint for failure to state a claim. (ECF No. 11). The parties briefed the issues, (ECF No. 12, 16, 17, 20), and the Court heard oral argument on January 6, 2020. The Motion is now ripe for decision.

Based on the following reasoning, Ashland's Motion to Dismiss will be granted in part and denied in part.

**I. Background**

Solid State produces and sells solid maleic anhydride, a chemical often used for manufacturing resins for fiberglass-reinforced products. (ECF No. 1, at ¶¶ 3–4). In February 2017, Solid State and Ashland LLC began discussing moving Solid State's solid maleic anhydride line from a facility in Alabama to Ashland's facility at Neville Island, Pennsylvania. *Id.* at ¶¶ 18–19. After several months of presentations, discussions, and negotiations, *id.* at

¶¶ 20–37, the parties executed the Manufacturing Services Agreement on October 24, 2017, *id.* at ¶ 39. The Agreement went into effect on November 1, 2017, for an initial term of sixty months. *Id.* at ¶ 40.

Under the Agreement, Ashland was required to manufacture solid maleic anhydride for Solid State. *Id.* at ¶ 41. Section 2.9 of the Agreement, however, allowed for Ashland to stop production of solid maleic anhydride under certain circumstances, namely that, "In no event will Manufacturer be required to perform any of its obligations under this Agreement in[:] (i) an unsafe or imprudent manner; (ii) contravention of Manufacturer's environmental, health and safety standards; or (iii) violation of applicable laws." (ECF No. 12, at § 2.9). As for Solid State, the Agreement required it to provide certain equipment to Ashland, subject to a bailment agreement. (ECF No. 1, at ¶ 42). Solid State's equipment was delivered to Ashland's facility at Neville Island on November 29 and 30, 2017. *Id.* at ¶ 43.

The parties also anticipated that further capital investments or equipment might be required during the contract term. Section 2.10 of the Agreement consequently provides:

> As part of Manufacturer agreeing to manufacture the Products: (i) Manufacturer may be required to make additional capital investment to meet production needs, and (ii) Customer will provide Equipment to Manufacturer for the manufacture of the Products, which shall be subject to the Bailment Agreement attached hereto as Schedule 4. In the event that additional significant capital investments or equipment are required to meet production demands, the Parties will agree on an appropriate cost amortization or bailment agreement to be executed by the Parties and incorporated to the Agreement by reference.

(ECF No. 12, at § 2.10). In January 2018, Ashland decided that an automatic bagging machine was necessary and informed Solid State that "Ashland would be covering the cost because it was being mandated by Ashland." (ECF No. 1, at ¶¶ 45–46).

In early June 2018, in conjunction with a Pre-Start Safety Review and preliminary trials for the systems involved in the manufacturing line, "Ashland confirmed that the air produced by

the supplied breathing air system for the line had been tested and approved." *Id.* at ¶¶ 50–53. Ashland began manufacturing solid maleic anhydride by the end of June 2018. *Id.* at ¶ 55. Then, on July 27, 2018, Ashland issued a stop work order. *Id.* at ¶ 56. Two weeks later, Ashland made a list of action items needed to get the line up and running again. *Id.* at ¶ 59. The list "focused on training and protective gear for Ashland's employees" and did not include significant capital expenditures. *Id.* On August 20, 2018, Ashland informed Solid State that the line could resume operation. *Id.* at ¶ 60. Additional emissions testing in September 2018 and air quality monitoring in October 2018 showed that the solid maleic anhydride line complied with applicable permits and OSHA standards. *Id.* at ¶¶ 61–62.

On May 3, 2019, Ashland issued another stop work order. *Id.* at ¶ 66. On May 30, 2019, Ashland identified "seven broad scope, high capital jobs that each required a plan in place and capital approved before operation could resume." *Id.* at ¶ 70. Ashland did not include the automatic bagging machine, which had been delivered to the Neville Island facility the previous month but was not yet installed, among the seven projects. *Id.* at ¶¶ 65, 70. On July 1, 2019, Ashland notified Solid State that Ashland would terminate the agreement if Solid State did not commit to contribute toward the seven projects, plus the automatic bagging system. *Id.* at ¶ 72. Two weeks later, Solid State responded to Ashland, stating that it was Ashland, not Solid State, that was in breach of the Agreement. *Id.* at ¶ 73.

In the meantime, in June 2019, Ashland received test results from additional air monitoring done at the Neville Island facility. *Id.* at ¶ 71. The test results "showed that while all areas of the facility were in compliance with the OSHA regulations, many areas exceeded Ashland's purported internal exposure standards." *Id.* Ashland continued to operate its Neville Island facility despite those test results. *Id.* Nevertheless, Ashland did not resume operations of

the solid maleic anhydride line following the May 3, 2019 stop work order, and instead considered its Agreement with Solid State terminated as of August 1, 2019. *Id.* at ¶ 74.

Solid State subsequently filed the present Complaint, alleging breach of contract in Count One and negligent misrepresentation in Count Two. Ashland moves for dismissal of the Complaint under Federal Rule of Civil Procedure 12(b)(6).

**II. Legal standard**

In deciding a motion to dismiss a complaint under Rule 12(b)(6), a court must first "accept all factual allegations as true" and "construe the complaint in the light most favorable to the plaintiff." *Eid v. Thompson*, 740 F.3d 118, 122 (3d Cir. 2014) (internal quotations omitted). The court then must "determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Id.* A complaint is sufficient only when it is facially plausible, meaning that the court is able "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To be plausible on its face, the complaint must contain more than "[t]hreadbare recitals of the elements of a cause of action" and "mere conclusory statements." *Id.* The court need not "accept unsupported conclusions and unwarranted inferences." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).

When a court grants a motion to dismiss, the court "must permit a curative amendment unless such an amendment would be inequitable or futile." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010) (internal quotations omitted). Further amendment is inequitable where there is "undue delay, bad faith, dilatory motive, [or] unfair prejudice." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Amendment is futile "where an amended complaint 'would fail to state a claim upon which relief

could be granted.'" *M.U. v. Downingtown High Sch. E.*, 103 F. Supp. 3d 612, 631 (E.D. Pa. 2015) (quoting *Great Western Mining & Mineral Co.*, 615 F.3d at 175).

**III. Discussion**

A. Count One—breach of contract claims

Ashland seeks dismissal of Count One, in which Solid State alleges a breach of specific provisions of the Manufacturing Services Agreement as well as a breach of the implied covenant of good faith and fair dealing. (ECF No. 11, at 2; ECF No. 1, at ¶¶ 78–83). The parties agree that New York law governs their Agreement. (ECF No. 12, at 6 n.4; ECF No. 16, at 8 n.1).

*i. Breach of express contract provision*

Solid State alleges that Ashland breached the parties' contract by "failing to manufacture solid maleic anhydride for Solid State" as required by the Agreement and by "attempting to impose extra-contractual obligations on Solid State before Ashland resumes production." (ECF No. 1, at ¶ 81). Under New York law, a plaintiff claiming breach of contract must plead facts showing "(1) the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's breach of its contractual obligations, and (4) damages resulting from the breach." *Junger v. John V. Dinan Assoc., Inc.*, 164 A.D.3d 1428, 1430 (N.Y. App. Div. 2018) (internal quotations omitted). The proper interpretation of the parties' obligations under a contract, in the first instance, is a question of law for the court to decide. *Ellington Credit Fund, LTD. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 189 (S.D.N.Y. 2011); *Lynch v. Inter-County Bldg. Materials Corp.*, 2013 U.S. Dist. LEXIS 148313, at *24 (E.D.N.Y. Oct. 15, 2013). When a contract is unambiguous, the court must look only within the four corners of the contract and enforce the contract according to the plain meaning of its terms. *Ellington v. EMI*

5

*Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014); *Lynch*, 2013 U.S. Dist. LEXIS 148313, at *25. However, "when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or when specific language is susceptible of two reasonable interpretations," *Ellington*, 21 N.E.3d at 1003 (internal citations and quotations omitted), the court may look to extrinsic evidence to resolve the ambiguity, *Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012). At the motion to dismiss stage, "if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state claim." *Bayerische Landesbank*, 692 F.3d at 56. Accordingly, the "court should resolve any contractual ambiguities in favor of the plaintiff." *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d 151, 160 n.4 (S.D.N.Y. 2014) (internal quotations omitted).

Ashland argues that Solid State's breach of contract claim should be dismissed because "the Complaint itself shows that Ashland's decision to stop producing was consistent with the Manufacturing Agreement." (ECF No. 12, at 1). Ashland contends that Section 2.9 of the Agreement expressly authorized Ashland to shut down the maleic anhydride production line, with no duty to make efforts to resume operation, when air monitoring showed levels above Ashland's environmental, health, and safety standards. *Id.* at 1–2, 7–9. Ashland further argues that once it determined that significant capital investments were needed to resume operation—that is, "to meet production demands"—Section 2.10 of the Agreement required Solid State to contribute toward the costs. *Id.* at 9; ECF No. 17, at 3. Thus, according to Ashland, Solid State's refusal to contribute excused Ashland from making the capital investments and, consequently, from further performance. (ECF No. 12, at 9; ECF No. 17, at 3).

Solid State disagrees, arguing that the Agreement did not "allow Ashland to terminate the contract because Ashland was unable to provide a safe and suitable environment in accordance

with its internal safety standards for its employees." (ECF No. 16, at 10). Rather, according to Solid State, Ashland had a duty "to ensure that its own site, building, and auxiliary services met Ashland's internal environmental, health and safety standards." (ECF No. 16, at 5). In that vein, Solid State contends that the "meet production demands" language in Section 2.10 refers to additional investments and equipment needed to increase production of solid maleic anhydride. (ECF No. 16, at 5, 8–9). Solid State disagrees with Ashland's interpretation of Section 2.10 and says that "meet production demands" does not refer to equipment that Ashland may need to meet its own internal safety standards. *Id.* Solid State consequently argues that it was not required to contribute toward the seven capital investment projects. *Id.* In support of its argument, Solid State points to Ashland's prior course of performance, in which Ashland decided to cover the cost of the automatic bagging machine because Ashland was mandating its use for the safety of its workers. (ECF No. 1, at ¶¶ 45–46; ECF No. 16, at 9 n.3). Additionally, Solid State argues that "even if Solid State had an obligation to contribute to the capital improvements, it was not obligated to simply write a blank check to Ashland." (ECF No. 16, at 5, 9). Solid State asserts that because "Ashland made no effort to propose an appropriate cost amortization plan, nor an agreement to be executed by the parties," Solid State was not obligated to engage in further negotiations regarding contribution. (ECF No. 16, at 5, 9).

First, a plain reading of Section 2.9 shows that the parties agreed that Ashland could shut down the production line in certain circumstances. Relevant here, Ashland could shut down the line when continued production would contravene Ashland's internal standards. Thus, when testing showed that the air quality contravened Ashland's standards, and Ashland issued the May 3, 2019 stop work order, Ashland did not breach the contract. That said, the Court disagrees with Ashland's assertion that it did not have an obligation to resume operation and that "no more

7

was required of Ashland."  (ECF No. 12, at 7).  Section 2.9 only says that Solid State could not require Ashland to perform when doing so would not comply with safety standards.  The Agreement does not speak to Ashland's duties, or lack thereof, in relation to bringing the production line into compliance with the safety standards.

That leads to the next, and perhaps the main, issue: what exactly were the parties' respective obligations in relation to bringing the production line into compliance with the relevant safety standards?  Both parties point to Section 2.10, which addresses the anticipated situation in which additional capital investments or equipment might be needed for performance of the contract.  The parties seem to agree that the seven projects at issue qualify as "additional significant capital investments or equipment" within the meaning of the second part of Section 2.10, which states, "In the event that additional significant capital investments or equipment are required to meet production demands, the Parties will agree on an appropriate cost amortization or bailment agreement to be executed by the Parties and incorporated to the Agreement by reference."  The parties diverge, however, at the meaning of "to meet production demands."  The parties' arguments indicate that this term is ambiguous, in that it either refers to (a) any significant capital investments or equipment necessary to enable production of the solid maleic anhydride line, including for worker safety, or (b) only significant capital investments or equipment related to an increase in the quantity of solid maleic anhydride needed by Solid State.  The Court has searched the Agreement in its entirety for clarification, but finds none.

Because the language of the Agreement does not resolve the ambiguity, the Court may consider extrinsic evidence.  Solid State points to Ashland's prior performance regarding the automatic bagging machine as support for its position.  But this does little to determine what "meet production demands" means.  If the automatic bagger was simply an "additional capital

8

investment," then Section 2.10 of the Agreement seems to place the responsibility of paying for the automatic bagger on Ashland. If, however, the automatic bagger was an "additional *significant* capital investment," then that would place the automatic bagger under the relevant provision and aid the Court in interpreting the meaning of "meet production demands." Unfortunately, neither the Agreement nor the Complaint answers the question of whether the automatic bagger was a significant capital investment.[1]

Because the Court cannot resolve the ambiguity within the four corners of the contract or by the extrinsic evidence offered in the Complaint, the Court must, at this stage of litigation, resolve the ambiguity in favor of Solid State. Accordingly, at this stage of the proceedings, Solid State has pleaded sufficient facts to set forth the basic elements to avoid dismissal of Count One. Ashland's Motion to Dismiss is therefore denied as to Solid State's breach of contract claim.

*ii. Breach of implied covenant of good faith and fair dealing*

Next, Ashland seeks dismissal of Solid State's claim that "Ashland has breached the contract by . . . breaching its duty of good faith and fair dealing." (ECF No. 1, at ¶ 81). The covenant of good faith and fair dealing is implied in every contract. *Gutierrez v Government Empls. Ins. Co.*, 136 A.D.3d 975, 976 (N.Y. App. Div. 2016). This implied covenant "is a

---

[1] The Court notes here that Section 2.10 is rife with interpretation issues. First, it is unclear what "meet production *needs*" means and how "production needs" are different from "production demands." Additionally, how is "for the manufacture of the Products" different from "to meet production needs" and "to meet production demands"? Next, the first sentence in Section 2.10 uses the word "may" in regard to Ashland's obligation, but "will" in relation to Solid State's obligation. Does this difference in word choice speak more to the parties' certainty (or lack thereof) in relation to future costs, or does it evince a lack of agreement on what Ashland would be obligated to provide? Lastly, the later part of Section 2.10—which states that "the Parties will agree on an appropriate cost amortization or bailment agreement"—appears to be either an unenforceable agreement to agree or, as recognized under New York law, a preliminary binding commitment. *Adjustrite Sys. v. GAB Bus. Servs.*, 145 F.3d 543, 548 (2d Cir. 1998). These are all issues that the parties will likely need to sort out as they move forward.

pledge that neither party to the contract shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruit of the contract, even if the terms of the contract do not explicitly prohibit such conduct." *Id.* Stated differently, a party "may be in breach of the implied duty of good faith and fair dealing . . . when it exercises a contractual right as part of a scheme to realize gains that the contract implicitly denies or to deprive the other party of the fruit (or benefit) of its bargain." *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 97 A.D.3d 781, 784 (N.Y. App. Div. 2012) (internal quotations omitted). The implied covenant thus "encompasses any promise that a reasonable promisee would understand to be included." *Elmhurst Dairy, Inc. v. Bartlett Dairy, Inc.*, 97 A.D.3d 781, 784 (N.Y. App. Div. 2012). It cannot be used, however, "to impose new contract terms that could have been bargained for but were not." *Tuscan/Lehigh Dairies, Inc. v Beyer Farms, Inc.*, 136 A.D.3d 799, 802 (N.Y. App. Div. 2016) (internal quotations omitted).

Ashland seeks dismissal of this portion of Solid State's breach of contract claim on the basis that "[t]he Complaint contains no allegations that separately state a claim for breach of Ashland's duty of good faith and fair dealing." (ECF No. 12, at 9). Specifically, Ashland argues that because "Ashland acted in accordance with the Manufacturing Agreement, . . . there can be no breach of good faith and fair dealing." *Id.* Having found that Solid State has pleaded facts sufficient to state a breach of contract claim, Ashland's argument concerning the alleged breach of the duty of good faith and fair dealing fails. Ashland's Motion to Dismiss is therefore denied as to Solid State's good faith and fair dealing claim.

B. Negligent misrepresentation claim

Ashland also seeks dismissal of Count Two, in which Solid State brings a claim of negligent misrepresentation. (ECF No. 12, at 10; ECF No. 1, at ¶¶ 84–100). As to this claim,

Solid State contends that Pennsylvania law applies. (ECF No. 16, at 13). Ashland, however, says that there is no conflict between Pennsylvania and New York law on these issues, so the Court does not need to decide choice of law at this time. (ECF No. 12, at 10 n.8; ECF No. 17, at 8 n.4). Because the parties do not raise a dispute regarding choice of law at this juncture, the Court will apply Pennsylvania law for the purposes of this Motion.

Solid State alleges in Count Two that, prior to executing the Agreement, Ashland failed to disclose three things. First, Ashland did not "disclose to Solid State that Ashland had internal environmental standards that differed materially from the OSHA regulations." (ECF No. 1, at ¶ 92). Second, Ashland did not disclose before executing the Agreement "that its internal environmental standards could interfere with Ashland's ability to perform under the Agreement." *Id.* at ¶ 93. And lastly, Ashland did not "disclose that after execution of the Agreement it would still require additional approvals from other Ashland representatives before Ashland could perform under the Agreement." *Id.* at ¶ 94. Ashland argues that Count Two must be dismissed because the underlying duty arises from contract, not from tort, which is disallowed under the gist of the action doctrine; the contract contains an integration clause; and, the economic loss doctrine precludes this claim. (ECF No. 12, at 2).

The Court turns first to the fact that the Agreement contains an integration clause. When a contract contains an integration clause, "a plaintiff cannot use parol evidence to establish that she was fraudulently induced to sign a contract where the contract's representations are contrary to a defendant's alleged precontractual misrepresentations." *Calhoun v. Invention Submission Corp.*, 2019 U.S. Dist. LEXIS 60699, at *16 (W.D. Pa. Apr. 4, 2019). Here, Section 2.9 of the Agreement explicitly states the existence of Ashland's internal standards; Solid State thus was on notice that the standards existed. And, given the subsequent phrase addressing "applicable

11

laws," Solid State was on notice that the standards may differ from OSHA regulations. That Solid State did not know exactly what those standards contained is in Solid State's hands—before signing the contract, Solid State could have asked Ashland to provide a copy of those standards. Furthermore, by signing the Agreement, Solid State agreed that Ashland's internal standards could interfere with Ashland's performance of the contract. After all, the parties included the existence of Ashland's internal standards in a provision that allows Ashland to suspend production if continued production would contravene its standards. Thus, Ashland's Motion to Dismiss, as it pertains to Solid State's allegations that Ashland negligently misrepresented the existence and applicability of its internal standards, must be granted.

Additionally, as to the gist of the action doctrine, Solid State has neither pleaded nor argued the existence of any social or tort duty that is distinct from Ashland's contractual duties. All three alleged failures to disclose revolve around duties arising from the parties' contractual relationship, not an independent social duty. For this reason, Ashland's Motion to Dismiss Solid State's negligent misrepresentation claims must be granted.

Having found that the contract language specifically references Ashland's internal standards and that the gist of the action doctrine forecloses Solid State's negligent misrepresentation claim, Count Two fails to set forth a claim. The Court thus does not need to address Ashland's argument based on the economic loss doctrine.

**IV. Conclusion**

THEREFORE, based on the foregoing, Defendant Ashland LLC's Motion to Dismiss for failure to state a claim is DENIED as to Count One and GRANTED as to Count Two. Count Two is therefore dismissed. Plaintiffs shall have until **February  10 , 2020** to amend their Complaint in accordance with this Opinion. Defendant shall file a response within fourteen (14)

days of either the foregoing deadline or the filing of an Amended Complaint, whichever is earlier.

IT IS SO ORDERED.

DATE January 27, 2020

Marilyn J. Horan
United States District Judge