IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

SOLID STATE CHEMICALS LTD., AND;　)
AND SOLID STATE CHEMICALS INC.,　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　vs.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
ASHLAND LLC,　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)

2:19-CV-01044-MJH

　　　　　　　Defendant,

OPINION

　　　　Plaintiffs, Solid State Chemicals LTD and Solid State Chemicals Inc., bring the within

action against Defendant, Ashland, LLC, arising out of an alleged breach of a Manufacturing

Services Agreement (MSA). (ECF No. 22).  Ashland asserted a counterclaim on the same MSA.

(ECF No. 23).  Both Ashland and Solid State have moved for summary judgment on their

respective claims and counterclaims.  (ECF Nos. 54 and 57).  The matter is now ripe for

consideration.

　　　　After consideration of Ashland and Solid State's Motions for Summary Judgment (ECF

Nos. 54 and 57), their respective briefs (ECF Nos. 55, 61, 69, 74, 82, and 84), Concise

Statements of Material Fact and Appendices (ECF Nos. 56, 58-60, 65-66, 70-72, 75-76, 79-80,

85-88), the relevant pleadings, and for the following reasons, each of Ashland and Solid State's

Motions for Summary Judgment will be granted in part and denied in part.

　　　　I.　　　　Background

　　　　 This dispute arises out of an MSA contract between Solid State and Ashland, which had

an effective date of November 1, 2017, wherein Solid State agreed to supply raw materials and

Ashland agreed to manufacture them into solid maleic anhydride. (ECF No. 85 at ¶ 21).

Maleic anhydride, a common chemical intermediary, is a dangerous chemical and can be harmful to humans. *Id*. at ¶ 9.  As such, it is subject to strict OSHA limits to protect workers from exposure. *Id*. at ¶ 10. The relevant OSHA standards have not been updated since the 1970s, and some companies rely upon other industry standards, such as the American Conference of Governmental Industrial Hygienists ("ACGIH") Threshold Limit Value ("TLV"). *Id*. at ¶ 11. For maleic anhydride, the current ACGIH TLV-TWA [time weighted average] of 0.01 mg/m3 (0.0025 ppm) was adopted in 2011.  *Id*. at ¶ 12.  The existing OSHA Personal Exposure Limit (PEL) of 1 mg/m3 (0.25 ppm) is 100 times less stringent than the AGCIH TLV.  *Id*. On September 30, 2016, Ashland issued its latest policy standard for its operational Industrial Hygiene and Occupational Health Standard ("Ashland IH Policy"). *Id*. at ¶ 13.  Said Policy requires that the lowest available Occupational Exposure Limit ("OEL")  for exposure assessments shall be established according to a listed hierarchy of OELs, including the ACGIH TLV.  *Id*.  Thus,  since 2016, Ashland's relevant IH Policy for exposure limits for maleic anhydride has been 0.01 mg/m3 (0.0025 ppm).

In early 2017, Jason Perry, president of Solid State, met with Ashland personnel to discuss the possibility of operating a pastillator line to produce solid maleic anhydride pastilles at Ashland's facility in Neville Island, PA.  *Id*. at ¶ 20.   In anticipation of such business venture, in June 2017, Ashland's Neville Island plant manager, John Greer, plant engineer, Al Lang, and environmental health and safety and industrial hygiene experts began appropriate hazard assessments and assembled information on what was needed to obtain the necessary permits.  *Id*. at ¶ 22.  During this process, Kara Long, Ashland's environmental health and safety specialist, noted, "safety/IH concerns over this project due to the low OEL of maleic." *Id*.  Kristi Hames, Neville Island's industrial hygienist, raised this same concern in regard to the pastillator line,

commenting that "[w]e can't rely on respirators alone to reduce exposures." *Id*. On July 19, 2017, Jason Perry attended a meeting at Neville Island to discuss the pastillator process design and "all possible safety aspects of the process." *Id*. at ¶ 23. Ashland's Design Engineering Group reviewed the plans for building upgrades to install and connect the pastillator at Ashland's Neville Island facility. *Id*. at ¶ 24. Between August and October 2017, Ashland and Solid State negotiated various provisions of the MSA. *Id*. at ¶ 25. The MSA was executed in late October 2017 and became effective on November 1, 2017. *Id*. at ¶ 26.

Under the MSA, Ashland was to manufacture solid maleic anhydride exclusively for Solid State at Ashland's Neville Island facility "as specified in purchase orders submitted by" Solid State. *Id*. at ¶ 27. The purchase orders were to identify the quantity, date of delivery, and price. *Id*. Upon receipt of a purchase order, Ashland was to "acknowledge and confirm" the order and expected delivery dates. *Id*. Notwithstanding said MSA provisions, Solid State never submitted any such purchase orders. *Id*. at ¶ 31.

Under the MSA, Solid State was to provide the necessary equipment, raw materials, and product specifications, and Ashland was to ensure the Neville Island location had all necessary permits and approvals to manufacture and store solid maleic anhydride pastilles and to ensure that operation of the location was "compliant with all applicable laws." *Id*. at ¶ 28. Because Ashland had not manufactured solid maleic anhydride for years, and because it had never made maleic anhydride pastilles using a pastillator, the MSA provided that Ashland's obligation to run the line was expressly contingent on the line meeting all of Ashland's legal and internal health and safety standards. *Id*. at ¶ 29. Section 2.9 of the MSA provides:

> 2.9. [Ashland] shall ensure that the Manufacturing Location has and maintains during the Term all permits and approvals necessary to manufacture and store the Products and the Raw Materials used to produce the Products and that the operation of the Manufacturing Location is compliant with all applicable laws. In

no event will [Ashland] be required to perform any of its obligations under this
Agreement in; (i) an unsafe or imprudent manner; (ii) contravention of
[Ashland]'s environmental, health and safety standards; or (iii) violation of
applicable laws.

(ECF No. 22-2 at pp. 3-5).   The MSA also required:

2.10 As part of [Ashland] agreeing to manufacture the Products: (i) [Ashland]
may be required to make additional capital investment to meet production needs,
and (ii) [Solid State] will provide Equipment to [Ashland] for the manufacture of
the Products, which shall be subject to the Bailment Agreement attached hereto
as Schedule 4. In the event that additional significant capital investments or
equipment are required to meet production demands, the Parties will agree on an
appropriate cost amortization or bailment agreement to be executed by the
Parties and incorporated to this Agreement by reference.

*Id*.

In late November and early December 2017, Solid State's pastillation equipment was
delivered to Neville Island and installation efforts began. (ECF No. 85 at at ¶ 33).  Ashland hired
TRC Environmental Corporation ("TRC"), an environmental engineering firm. *Id*. at  ¶ 34.   On
December 12, 2017, TRC conducted an onsite review of the areas where the pastillator line was
to be located, the process equipment and associated ventilation systems, and the available design
information in order to evaluate the proposed pastillation process and the objective to keep
employee exposures below the ACGIH TLV standard.  *Id*.  On December 13, 2017, David Miller
of Ashland's Industrial Hygiene department emailed Ashland's plant management and corporate
personnel recommending against installing the pastillator because of toxic exposure concerns.
*Id*. at ¶ 35.  Mr. Miller noted that, requiring Personal Protective Equipment (PPE) as the primary
source of protection for workers, would not be a viable option. *Id*. Ashland issued final approval
for expenditures totaling $900,000 related to the pastillator project during January 2018.  *Id*. at  ¶
36. In early 2018, installation of the pastillator line was completed.  *Id*. at ¶ 37.

Initial startup runs on the line occurred during June 2018.  *Id*. at  ¶ 40.  During startup, all air sampling conducted from the pastillator line, for time-weighted, 8-hour personal exposures, were above Ashland's IH Policy for environmental health and safety standards.  *Id*. at ¶ 41.  In late July 2018, due to exposure concerns, Ashland placed pastillator operations on hold.  *Id*. at ¶ 42.  The plant immediately took steps to protect workers and to reduce exposures, and Solid State "accepted this plan as a prudent path forward."  *Id*.  Consistent with the Ashland IH Policy, Ashland sought and secured approval for an internal variance to allow the pastillator to temporarily operate with employees using PPE.  *Id*. at ¶ 43. Ashland's IH team required that TRC return to the plant to evaluate the pastillator line. *Id*. at ¶ 44.  In order to reduce maleic anhydride exposure, TRC proposed several improvements, including an autobagger at the bagging area, to reduce one of the most significant sources for exposure.  *Id*.  During July 2018, Ashland authorized $544,047 to purchase an autobagger and for related expenses.  *Id*. at ¶ 46.

Ashland also created a list of necessary improvements for the pastillator line in order to incorporate TRC's suggestions.  *Id*. at ¶ 47.  Short-term improvement plans included installing new ducts on the line and replacing exhaust fans. *Id*.  Longer-term improvement plans included conducting additional Process Hazard Analyses (PHAs) on line equipment.  *Id*. The August 2018 temporary PPE variance, to allow for continued operation of the pastillator line, required that air quality remain within acceptable ranges with PPE use and that the short and long term recommended improvements timely progress to completion.  *Id*. at ¶ 48.  In September 2018, stack testing was conducted to evaluate the performance of the scrubber and its impact upon emissions outside the building, and such testing showed that emissions complied with Ashland's permit.  *Id*. at ¶ 49.  However, October 2018 air samples all significantly exceeded the exposure limits established under Ashland's IH policy.  *Id*. at ¶ 50.

On May 3, 2019, Patrick Hendricks, an Ashland industrial hygienist, visited the Neville Island facility and communicated a number of pastillator line safety concerns to Ashland management. *Id*. at ¶ 54.  His observations included pastille bag breakage during operations, maleic anhydride pastilles spillage, and potential corrosion of the pastillator equipment.  *Id*.

Because the level of maleic anhydride exposure at the pastillator line presented serious employee health risks, Ashland shut the line down on May 3, 2019.  *Id*. at  ¶ 55. After the line was shut down, May 20, 2019, air samples showed no maleic anhydride levels above the laboratory limit of 0.0005 ppm.   *Id*. at ¶ 56.  During May 2019, Ashland refined and finalized its list for changes necessary for the pastillator line to operate within Ashland's IH Policy guidelines.  *Id*. at ¶ 57.  Jason Perry and Al Lang also discussed installing the autobagger, which by then had arrived on site. *Id*.  In addition, Ashland periodically updated Jason Perry of Solid State on this process.  *Id*.

On May 30, 2019, Jason Perry visited Neville Island and attended a meeting with Ashland personnel. *Id*. at ¶ 58. As summarized by Neville Island's plant manager's email to Solid State after the meeting, the following action items were required to restart the pastillator:

1.  Replace Air Purifying unit with unit that meets Ashland standard.

2. Plan in place for Tempered Air to Bagging Room

3. Plan in place to replace Baghouse with Scrubber

4. Plan in place for Tempered Air to Palletizing area

5. Install general ventilation to the Building

6. Install central vacuum system

7. Run sprinkler piping to inside the enclosures and verify enclosure panels are acceptable

*Id.* The estimated cost of $1,000,000, possibly as much as $2,000,000, for said improvements was discussed at the May 30, 2019 meeting. *Id.* at ¶ 59. John Flately of Ashland stated that Ashland would not request another variance for PPE to restart the line unless a plan was in place or capital was approved for the seven action items because they were "must dos. You have to do them to run the system." *Id.* Jason Perry indicated he would not cooperate with the efforts to make these changes to the pastillator line. *Id.* Dave Miller of Ashland testified that Mr. Perry said "[t]here's no use in carrying on this discussion," Mr. Perry then departed the room "and left us with the impression that ... the next contacts would be with his lawyer." *Id.*

As the MSA Section 3.2 required, Ashland invoiced Solid State for the pastilles that were produced between August 2018 and early May 2019, and Solid State paid those invoices up to and including April 15, 2019. *Id.* at ¶ 60. However, Solid State did not pay any invoices beyond April 15, 2019. *Id.* Solid State disagrees that it was obligated to pay those invoices, because it claims that an Ashland executive, Bob Moffitt told it not to pay because it gave him leverage in negotiating with Ashland; however, Ashland disputes Solid State's contentions and evidence. *Id.*

On May 31, 2019, Solid State initiated a discussion with Ashland about "ways to pay Solid State as part of an exiting of the arrangement." *Id.* at ¶ 61. On June 21, 2019, Solid State alleged that Ashland materially defaulted under the MSA because Ashland shutdown production. *Id.* at ¶ 62. On July 1, 2019, Ashland provided the 30-day MSA Section 9.2 written notice of Solid State's material breach of the MSA because Solid State failed to "agree on appropriate cost amortization in case of additional significant capital investments." *Id.* at ¶ 63. In said notice, Ashland notified Solid State that "[u]pon installation of this equipment and completion of the additional necessary safety measures, with clearance from our health and safety department,

Ashland will be prepared to resume the operation" of the pastillator line and expressed a willingness to come to an agreement "to support some of these expenditures." *Id*. On July 15, 2019, Solid State's counsel responded, reaffirming its position that Ashland was in breach because of its "unilateral decision to cease production."   Ashland asserts that Solid State refused to engage in discussions under MSA Section 2.10, because Solid State maintained that "Ashland's desire to improve health and safety in its facility" was "not a basis under the Agreement to allocate any, much less significant, capital costs to Solid State." *Id*. at  ¶ 64.  On July 31, 2019, Ashland wrote to Solid State and terminated the MSA pursuant to Section 9.2.  *Id*. at ¶ 65.   Neither party responded to the demands of the other; therefore, as of July 31, 2019, each party had declared termination of the MSA.

Each party has alleged that the other breached the MSA through their respective Complaint and Counterclaim. (ECF Nos. 22 and 23).   In addition, Ashland also counterclaims for Breach of the Implied Covenant of Good Faith and Fair Dealing and for Specific Performance. (ECF No. 23).  Solid State and Ashland have each moved for summary judgment against the other party's claims.  However, neither party has moved for summary judgment as regards Ashland's counterclaim for Specific Performance.

II.    Standard of Review

According to Federal Rule of Civil Procedure 56, a court must grant summary judgment where the moving party "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  For a dispute to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party."  *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 (3d Cir. 2017) (internal quotations omitted).  Additionally, for a factual dispute to be material, it must have an

effect on the outcome of the suit.  *Id.*  In reviewing and evaluating the evidence to rule upon a motion for summary judgment, the court must "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the" non-moving party.  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) (internal quotations omitted).  However, where "the non-moving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,'" the moving party is entitled to judgment as a matter of law.  *Moody*, 870 F.3d at 213 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "Discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion. Instead, the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Id.* at 256-57 (internal citation omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).  Judges are not "required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of the party."  *Id.* at 251 (internal citation omitted).

III.    Discussion

Both parties have asserted respective claims for breach of the MSA. Likewise, both have moved for summary judgment on those claims.   The parties' claims and counterclaims center on

four categories: allegedly unpaid invoices, cost sharing of capital investment, production shutdown, and equipment removal.

    A.  Claims and Counterclaims

In its motion for summary judgment on its breach of contract claim, Solid State maintains that Ashland breached the MSA when it ceased commercial production of solid maleic anhydride on May 3, 2019, and when, on July 31, 2019, Ashland proceeded to terminate the contract. Solid State further contends that, under the termination provisions of the MSA, Ashland could only terminate the contract if Solid State materially breached the contract. As regards Ashland's assertions that Solid State materially breached the MSA when it failed to agree to contribute to capital costs, Solid State argues that it was only required to contribute to significant capital investments or equipment for the solid maleic anhydride production line if such were required to meet Solid State's production demands.

Ashland contends that Solid State breached the MSA Section 3.2 by refusing to pay $237,500.95  in invoices for product that was already accepted; and MSA Section 2.10 by refusing to engage with Ashland concerning cost amortization or bailment of additional significant capital investments or equipment needed to operate Solid State's line safely; and MSA Section 9.5 by abandoning its equipment and materials at the Neville Island plant.

The MSA directs that New York law governs the contract. (ECF No. 22-2 at p. 12). New York law defines breach of contract as: (1) the existence of a contact; (2) performance under the contract by one side; (3) breach of the contract by the other side; and (4) resulting damages. *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804 (N.Y. App. Div. 2011); *JP Morgan Chase v. JH Electric of New York, Inc.*, 69 A.D. 3d 802, 803 (N.Y. App. Div. 2010).

The interpretation of a contract is a matter of law for the court. S*ee 805 Third Ave. Co. v. M.W. Realty Assoc.,* 58 N.Y.2d 447, 461 N.Y.S.2d 778, 448 N.E.2d 445; *Gassman v. Rothlein,* 275 A.D.2d 731, 713 N.Y.S.2d 208). Where the language of a contract is unambiguous, "its interpretation is a matter of law and effect must be given to the intent of the parties as reflected by the express language of the agreement." Courts should construe contract language to conform with the purpose of the agreement. *Howe v. Bank of New York Mellon*, 783 F.Supp.2d 466, 479 (S.D.N.Y. 2011). Whether either party breached the MSA requires examination of the contractual duties within the MSA that relate to each claimed breach.

1. Invoices

MSA Section 3.2 provides for the payment of invoices as follows:

> [u]nless otherwise agreed between the Parties, [Ashland] shall invoice [Solid State] on a monthly basis for the (i) direct labor costs and utilities required to manufacture the Products on the respective billing cycle, and; (ii) a tolling fee calculated on a per pound of Product manufactured basis.  Payments shall be due within thirty (30) days following the date of the invoice.

(ECF No. 22-2 at pp. 5-6).   For invoices up to and including April 15, 2019, Solid State had timely paid Ashland's invoices.  Ashland claims that Solid State breached the terms of the MSA by failing to pay invoices for pastilles following Solid State's last payment on May 8, 2019.  Said unpaid invoices totaled $237,500.95. (ECF Nos. 85 at ¶ 60 and 23-2). Solid State denies that it was obligated to pay those invoices, because it contends that the parties orally modified the MSA with regard to payment of the pastilles produced.

As regards oral modification of the MSA, in his declaration, Solid State's President, Jason Perry, asserted as follows:

> 101. After the May 30, 2019 meeting at Ashland's Neville Island facility, I went to Ashland's Dublin, Ohio headquarters to meet with my commercial contact at Ashland, Bob Moffit the next morning, May 31, 2019.

102. Mr. Moffit and I discussed the situation and what could be done moving forward to get the solid maleic anhydride production line operating again or, at the very least, to mitigate the damage being done to Solid State as a result of Ashland's shut down of the line and refusal to restart the line until the list of seven capital improvement projects Ashland identified on May 30 were fleshed out, approved, and funded by Ashland, which he acknowledged was not going to happen.

103. Since Bob Moffit and I both acknowledged that it appeared that production was not going to proceed again, the conversation turned to how Ashland could get Solid State out of the situation without Solid State being catastrophically damaged.

104. Mr. Moffit understood that Solid State had debt to cover. So we discussed paths such as Ashland purchasing the equipment, writing off the outstanding invoices, or selling molten maleic anhydride to Solid State who could then resell it at a higher price in the general market.

105. No conclusions were reached, but Mr. Moffit said he would take those ideas to his supervisor, Andy Beer.

106. At that meeting, I offered to pay the outstanding invoices as a sign of good-faith if that would help get the line restarted—Solid State's last payment to Ashland was made on May 8, 2019, which covered invoices with a due date prior to and including April 15, 2019.

107. I was told by Mr. Moffit not to pay those invoices because that gave me leverage in negotiating with Ashland; I relied on Mr. Moffit's instructions.

108. His explanation was that writing off invoices was something that his group could control and be done relatively easily.

(ECF No. 76-14 at ¶¶ 102-108). As regards Mr. Perry's assertions, Mr. Moffit testified:

Q.      Did you have a conversation with Mr. Perry in person where you told him not to pay the Ashland invoices because that was his only leverage?

A.      I don't think I would have said that. I do think, you know, again, we were trying to find a way to keep Jason as least impacted as possible and often I would tell Jason to delay paying invoices or, you know, we would come to an agreement that you can – even though our terms were probably 30 or 45 days that, you know, he could hold off paying that until the next shipment was sold or if he had, you know, a cash flow issue, you know, we would allow him to deviate from our agreement, you know, the contractual agreement, you know, the contractual agreement on payment terms. So I don't think I would have ever said don't do

> this so you'd have more leverage, but certainly we did, you know, suggest ways
> for Jason to manage his finances in a way that wouldn't put him in a bad spot.

(ECF No. 86-4 at pp. 133-134).   The content of both Mr. Perry and Mr. Moffit's assertions does

not expressly convey any intent to modify MSA Section 3.2.   Instead, the exchange between Mr.

Perry and Mr. Moffit only discussed withholding payment for leverage.   With regard to

invoices, Mr. Perry's declaration makes no reference to the MSA or any indication of Mr.

Moffit's intent or authority to modify the MSA.   All references to the payment of invoices

concern issues that "could" be addressed with Mr. Moffitt's supervisor.   The record contains no

indication that Mr. Moffitt could authorize any agreements or modifications to the MSA.

Indeed, even Mr. Perry acknowledges that "no conclusions were reached" in his discussions with

Ashland.   Despite Mr. Perry's contentions, it is clear, from both his declaration and Mr. Moffitt's

testimony, that neither the MSA generally nor Section 3.2 was orally modified.

Even if the record established any question of material fact as to oral modification, which

the Court finds it does not, the MSA specifically precludes amendment or modification except as

defined by Section 11.4.   MSA Section 11.4 provides, "no supplement, modification or

amendment of the Agreement shall be binding unless in writing and executed by [Solid State]

and [Ashland]."  (ECF No. 22-2 at p. 12).   Therefore, absent a written agreement to modify,

signed by both parties, the MSA does not permit modification.   In an effort to avoid the impact

of Section 11.4, Solid State argues that Ashland waived the writing requirement when Ashland

orally told Solid State that it need not pay any further invoices.   Specifically, Solid State argues

that Ashland waived MSA Section 11.4 when Mr. Moffitt induced Mr. Perry not to pay.

However, Solid State's arguments are unavailing, as the MSA precludes any ability to orally

modify or waive provisions.

New York law permits parties to "knowingly, voluntarily and intentionally" abandon their contract rights by waiver. *See Fund'l Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006). Waiver is evidenced by "affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage." *Id.* (internal citations and quotations omitted). Courts maintain that the presence of a non-waiver clause "does not preclude a contract from being 'effectively modified by actual performance and the parties' course of conduct.'" *1301 Prop. Owner LP v. Abelson*, No. 653342/2013, 37 N.Y.S.3d 207, at *5 (N.Y. Sup. Ct. Apr. 1, 2016) (quoting *Aiello v. Burns Int'l Sec. Servs. Corp.*, 110 A.D.3d 234, 245 (1st Dep't 2013)).

Here, the record demonstrates no evidence of a modification through actual performance. Ashland performed under the contract by producing pastilles for Solid State and by issuing invoices under the MSA.  Ashland's delivery of the pastilles and issuance of invoices under MSA 3.2 triggered Solid State's contractual duty to pay said invoices within thirty (30) days. There is no question of material fact that Solid State did not and has not paid said invoices, totaling $237,500.95.

The record also demonstrates no evidence of a modification through a course of conduct with regard to the regular payment of invoices.   As of May 8, 2019, Solid State had paid all of Ashland's invoices, up to and including the invoice of April 15, 2019.  (ECF No. 76-14 at ¶ 106). Said course of conduct, of consistent payment of invoices, does not support Solid State's contentions of an oral modification of its duty to pay Ashland under the MSA.  Solid State presents no other evidence as to any other conduct to support any basis to find a modification of the express terms of the MSA or of any waiver of Ashland's contractual right to be paid.

Ashland performed its duties of production and delivery of pastilles under the MSA for

the invoices that it issued.  Solid State had a duty to pay said invoices.  Solid State did not pay

$237,500.95, as invoiced.   Therefore, there is no question of material fact that Solid State

breached MSA Section 3.2 and that Ashland thereby incurred damages.  Ashland has presented

that the past due invoices total $237,500.95.  In its responses to Ashland's Motion for Summary

Judgment and Concise Statement of Material Facts, Solid State conceded that said invoices were

not paid. Solid State did not affirmatively contest the amount of said invoices. Thus, there is

likewise no genuine question of material fact that the damages incurred by Ashland as a result of

Solid State's breach of MSA Section 3.2 total $237,500.95.

Accordingly, Ashland's Motion for Summary Judgment on its Counterclaim for past due

invoices will be granted, and Solid State's Moton for Summary Judgment on Ashland's

Counterclaim for past due invoices will be denied.    Judgment will be entered against Solid State

on Ashland's Counterclaim for damages for non-payment of past due invoices in the amount of

$237,500.95.

2.   Cost Sharing of Capital Investment

Section 2.10 of the MSA provides as follows:

As part of [Ashland] agreeing to manufacture the Products: (i) [Ashland] may be
required to make additional capital investment to meet production needs, and (ii)
[Solid State] will provide Equipment to [Ashland] for the manufacture of the
Products, which shall be subject to the Bailment Agreement attached hereto as
Schedule 4. In the event that additional significant capital investments or
equipment are required to meet production demands, the Parties will agree on an
appropriate cost amortization or bailment agreement to be executed by the
Parties and incorporated to this Agreement by reference.

(ECF No. 22-2 at p. 5).

Ashland maintains that Solid State breached the MSA Section 2.10, because it refused to

participate in discussions with regard to expenditures needed for the pastillator line to safely

produce solid maleic anhydride.   Ashland contends said breach and conduct also constitute a

breach of the implied covenant of good faith and fair dealing.  Solid State argues that Ashland breached MSA Section 2.10 because Ashland was required "to make additional capital investment to meet production needs" and because Ashland terminated the MSA based upon its assertion that Solid State was required to participate in such expenditures.

MSA Section 2.10 describes three provisions that relate to equipment and expenditures. Two provisions describe equipment and expenditures, one reads to meet "production needs" and the other, to meet "production demands." However, the MSA defines neither term, and such terms are ambiguous because they are capable of multiple meanings and interpretations. Because of said ambiguity, the Court would otherwise examine "extrinsic or parol evidence to determine the parties' intent as to the meaning of that language." *Ames v. Cty. of Monroe*, 162 A.D.3d 1724, 1726, 80 N.Y.S.3d 774, 777 (N.Y. App. Div. 2018).  As argued above, each party has presented its own position as to the interpretation and effect of this language upon the duty of each party to pay for the capital investments and equipment at issue, which supports the existence of an ambiguity.  Ambiguity issues, however, are not dispositive of the claims involving MSA Section 2.10.

Section 2.10 is not legally enforceable against either party. It is "rightfully well settled" in New York "that a mere agreement to agree, in which a material term is left for future negotiation, is unenforceable." *Betty, Inc. v. Pepsico, Inc.*, 848 Fed.Appx. 43, 45 (2d Cir. 2021) (citation omitted).  Presently, the third provision of MSA Section 2.10 involves an agreement to agree, as it only states that the parties *will agree* on cost amortization or bailment agreement in the event of "additional significant capital investments or equipment are required to meet production demands."  MSA Section 2.10 leaves open for future negotiation material terms as to how the parties will allocate and apportion responsibilities for payment for additional significant

capital investments or equipment.  Further, Section 2.10 also fails to provide any terms by which

such costs were to be amortized.  MSA 2.10 also does not provide any terms for any additional

bailment agreement. Therefore, Section 2.10 contains material terms that were left to be agreed

upon in the future.  Such provision is merely an "agreement to agree."  As such, Section 2.10 is

not enforceable against either party.

Therefore, neither party may recover for Breach of Contract or Breach of Implied

Covenant of Good Faith and Fair Dealing as regards MSA Section 2.10.  *See FCOF UB Sec.*

*LLC v. MorEquity, Inc.*, 663 F.Supp.2d 224, 231 (S.D.N.Y. 2009) (New York law requires

dismissal of an implied covenant claim where the claim derives from the same set of facts as a

breach of contract claim).

Because of the unenforceability of their "agreement to agree," neither party may recover

under the provisions of MSA Section 2.10.  Accordingly, Ashland's Motion for Summary

Judgment on its Breach of Contract and its Breach of Implied Covenant of Good Faith and Fair

Dealing claim against Solid State under the provisions of MSA Section 2.10 will be denied.

Solid State's Motion for Summary Judgment on Ashland's Breach of Contract and Breach of

Implied Duty of Good Faith and Fair Dealing will be granted.

3.  Production Shutdown

Solid State claims that Ashland breached the MSA when Ashland ceased production of

solid maleic anhydride.  Ashland contends that it justifiably shutdown production due to

exposure levels that exceeded its own IH Policy, environmental health and safety standards.

Specifically, air sampling conducted in May 2019, showed all personal exposure samples, in

excess of the ACGIH TLV, with one sample as high as 0.59 ppm - more than double the OSHA

PEL and nearly 300 times the ACGIH TLV.  (ECF No. 85 at ¶ 53).  Ashland attempted to

17

mitigate these exposures by conducting air quality studies, purchasing and installing an

autobagger, and obtaining a variance for the temporary use of PPE.  However, Ashland

ultimately determined that it could not bring exposure levels under the ACGIH TLV without

substantial investments and equipment.

MSA Section 2.9 provides as follows:

2.9. [Ashland] shall ensure that the Manufacturing Location has and maintains
during the Term all permits and approvals necessary to manufacture and store the
Products and the Raw Materials used to produce the Products and that the
operation of the Manufacturing Location is compliant with all applicable laws. In
no event will [Ashland] be required to perform any of its obligations under this
Agreement in; (i) an unsafe or imprudent manner; (ii) contravention of
[Ashland]'s environmental, health and safety standards; or (iii) violation of
applicable laws.

(ECF No. 22-2 at p. 5).  There is no evidence that Ashland failed to maintain permits and

approvals.  There is no evidence that Ashland was not in compliance with applicable laws,

except for when the May 2019 levels exceeded OSHA regulations.  In addition, the record

establishes that the exposure levels in May 2019 also exceeded Ashland's IH Policy,

environmental health and safety standards.  Solid State does not dispute any exposure levels.

Thus, there exists no question of material fact that the provisions of MSA Section 2.9 apply to

relieve Ashland from performing its obligations under the MSA.   No provision of the MSA

required Ashland to make any expenditures or changes in order to meet safe emission levels

under its IH Policy or under MSA Section 2.9.  Ashland and Solid State bargained to absolve all

of Ashland's performance obligations in the event of safety issues that met the provisions of

Section 2.9.[1]   Therefore, as per Section 2.9, at any point where exposure levels exceed

---

[1] MSA Section 2.10 makes no reference to or provisions for safety or responsibility for
safety expenses.  Section 2.10 only refers to additional capital investment to meet production
needs, equipment for manufacture, and additional significant capital investments or equipment to

Ashland's environmental health and safety standards, Ashland "[i]n no event [was] required to perform any of its obligations under this Agreement." As such, Ashland had no duty to perform under the MSA to produce solid maleic anhydride when to do so was in contravention of Ashland's IH Policy, environmental health and safety standards.   Thus, Ashland did not breach the MSA, and Solid State is due no damages for the same.

Ashland also argues that it did not breach the MSA for production shutdown because Solid State had not submitted purchased orders pursuant to MSA Section 2.1. Ashland maintains that without purchase orders that it accepted under Section 2.1, it had no duty to produce.   MSA Section 2.1 provides:

> 2.1 During the Term and subject to the terms of this Agreement, [Ashland ] shall manufacture Product for [Solid State] as specified in purchase orders submitted by [Solid State] to [Ashland] ("Purchase Orders"). No term or provision of any such Purchase Order shall modify this Agreement, or vary or add to the terms hereof. Purchase Orders shall identify the quantity of the Product that [Solid State] wishes to purchase, the applicable prices for such Products calculated in accordance with Schedule 2 and the date of delivery for the Products, considering [Ashland's] Lead Times. All purchase orders are subject to [Ashland's] acceptance. [Ashland] shall acknowledge and confirm the Purchase Order and expected delivery dates, observing the applicable Lead Times.

(ECF No. 22-2 at p. 3).   Solid State argues that the "course of conduct" between the parties had established that formal purchase orders were not necessary because Ashland had ratified the informal process by not refusing to produce the volumes requested without actual written purchase order.   Therefore, Solid State asserts that it was not required to submit purchase orders before Ashland was required to produce under the MSA.   Resolution of Solid State's course of conduct issues would present questions of fact; however, Section 2.1 has no effect upon the disposition of Solid State's breach of contract claim against Ashland for cessation of production.

---

meet production demands.  Safety, while specifically addressed in MSA Section 2.9, is not referenced in Section 2.10.

As discussed above, pursuant to Section 2.9, Ashland was no longer required to perform any of its obligations under the MSA. Thus, Ashland's argument, as regards purchase orders, is moot.

Accordingly, Solid State's Motion for Summary Judgment on its claim for Breach of Contract, based upon Ashland's shutdown of production, will be denied, and Ashland's Motion for Summary Judgment on said Solid State's claim will be granted.

4.   Equipment Removal

Ashland contends that Solid State has breached MSA Section 9.5 by refusing to remove its equipment from Ashland's Neville Island facility.  Solid State denies that it is in breach of said provision, because the MSA imposes an obligation on Ashland to mutually agree with Solid State on the date and time for equipment removal, before its said obligations were triggered. MSA Section 9.5 provides as follows:

> 9.5. Upon expiration or termination of this Agreement, [Solid State] [will: (i) accept delivery, at [Solid State]'s expense, of all Raw Materials, labels and packaging materials that [Ashland] has purchased and/or the [Solid State] has provided for use by the [Ashland] hereunder, (ii) purchase any work-in-process Products and inventory of Product produced by the [Ashland] for [Solid State] in accordance with the Rolling Forecast and/or as ordered by the [Solid State]; and (iii) remove all the equipment owned solely by [Solid State] within 180 days, on the specific date and time agreed upon by [Ashland].

(ECF No. 22-2 at p. 10).   Given the operation of MSA Section 9.5, Solid State had a contractual obligation to remove its equipment within 180 days of termination.   Solid State has never offered to perform this duty and has not removed its equipment.   Furthermore, Solid State does not argue that its failure to remove was due to any lack of cooperation from Ashland.   MSA Section 9.5 required performance by Solid State beyond termination, Solid State has not performed and is therefore in default of said obligation.

Solid State also maintains that it has no duty to remove its equipment because Ashland wrongly terminated the MSA based upon Ashland's contention that Solid State had refused to

discuss or share significant capital investments or equipment expenses pursuant to MSA Section

2.10.   As regards termination, Section 9.2 of the MSA provided as follows:

> 9.2. This Agreement may be terminated by either Party in the event of a Material Default by the other Party in performing its obligations as stated in this Agreement if the Party in Material Default has not cured such Material Default within thirty (30) days after receipt of written notice of such Material Default.
>
> ***
>
> "Material Default" means a breach of this Agreement causing a detriment of such severity for the aggrieved Party as to impede the receipt of substantial performance promised under the agreement.

(ECF No. 22-2 at pp.  3,10).

Regardless of the basis for termination of the MSA and each party's claim of breach by the other, there is no question the MSA has been terminated.  As discussed above, Solid State breached the MSA by failing to pay invoices pursuant to MSA Section 3.2.  Said breach was a "material default," because it caused detriment to Ashland as to impede its receipt of payment in exchange for services performed as promised under the MSA.  Solid State's assertions of breach of contract by Ashland's cessation of production pursuant to MSA Section 2.9 fail because Ashland did not breach the MSA. Likewise, the bases for breach, pursuant to MSA Section 2.10, as asserted by each party against the other, did not result in any breach by either party. Both parties gave notice of material default by the other and neither party moved to cure in response to the other's notice within the 30-day timeframe specified by MSA Section 9.2.   There is no material question of fact that, following July 31, 2019, neither party acted in any way to challenge or question that the MSA was terminated.  As such, for purposes of Section 9.5, Solid State has a duty to remove its equipment.

Accordingly, Ashland's Motion for Summary Judgment on its counterclaim, as regards Solid State's Breach of Contract, MSA § 9.5, the removal of equipment, will be granted.  Solid

State's Motion for Summary Judgment on Ashland's counterclaim, under MSA Section 9.5, will be denied.   Solid State's Motion for Summary Judgment, on its defense that Ashland had wrongly claimed material default, will be denied. The issue of damages and/or specific performance as regards equipment removal will proceed to trial.

IV.    Conclusion

Following considering of the foregoing, the Court will enter a separate order reflecting the following:

Ashland's Motion for Summary Judgment on its Counterclaim, Breach of Contract, under MSA Section 3.2, for past due invoices will be granted.  Solid State's Motion for Summary Judgment on said Counterclaim for past due invoices will be denied.  Judgment will be entered against Solid State on Ashland's Counterclaim, Breach of Contract, MSA Section 3.2, with damages owed to Ashland for past due invoices against Solid State in the amount of $237,500.95.

Ashland's Motion for Summary Judgment on its Counterclaims for its Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing, MSA Section 2.10, for cost sharing of capital investments and equipment will be denied. Solid State's Moton for Summary Judgment on said Counterclaims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing for cost sharing of capital investments and equipment will be granted.   Judgment will be entered in favor of Solid State on said MSA Section 2.10 Counterclaims.

Solid State's Motion for Summary Judgment on its Breach of Contract claim for Ashland's shutdown of production will be denied. Ashland's Motion for Summary Judgment on

Solid State's Breach of Contract claim for shutdown of production, will be granted. Judgment will be entered in favor of Ashland.

Ashland's Motion for Summary Judgment on its Counterclaim for Breach of Contract, MSA Section 9.5, as regards Solid State's duty to remove of equipment, will be granted. Solid State's Motion for Summary Judgment on said Counterclaim will be denied. Solid State's Motion for Summary Judgment, on its defense that Ashland had wrongly claimed material default, will be denied. Judgment for liability for Breach of Contract, MSA Section 9.5, removal of equipment, will be entered in favor of Ashland. The issue of damages and/or specific performance as regard equipment removal will proceed to trial.

DATED this _____24th_____ day of March, 2022.

BY THE COURT:

_____
MARILYN J. HORAN
United States District Judge

23